J-S03016-21
J-S03017-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF: C.M.J. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: WESTMORELAND | : | |
| COUNTY CHILDREN'S BUREAU | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1003 WDA 2020 |

Appeal from the Order Entered August 13, 2020
In the Court of Common Pleas of Westmoreland County Orphans' Court
at No(s):  No. 137 of 2019

| | | |
|---|---|---|
| IN RE: ADOPTION OF: A.M.J. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: WESTMORELAND | : | |
| COUNTY CHILDREN'S BUREAU | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1004 WDA 2020 |

Appeal from the Order Entered August 13, 2020
In the Court of Common Pleas of Westmoreland County Orphans' Court
at No(s):  No. 136 of 2019

| | | |
|---|---|---|
| IN RE: ADOPTION OF L.M.J. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: WESTMORELAND | : | |
| COUNTY CHILDREN'S BUREAU | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1005 WDA 2020 |

Appeal from the Order Entered August 13, 2020
In the Court of Common Pleas of Westmoreland County Orphans' Court
at No(s):  No. 135 of 2019

IN RE: ADOPTION OF K.M.J.     :     IN THE SUPERIOR COURT OF
    :         PENNSYLVANIA
    :
APPEAL OF: WESTMORELAND     :
COUNTY CHILDREN'S BUREAU     :
    :
    :
    :
    :     No. 1006 WDA 2020

Appeal from the Order Entered August 13, 2020
In the Court of Common Pleas of Westmoreland County Orphans Court at
No(s): 134 of 2019


IN RE: ADOPTION OF: C.A.J.     :     IN THE SUPERIOR COURT OF
    :         PENNSYLVANIA
    :
APPEAL OF: WESTMORELAND     :
COUNTY CHILDREN'S BUREAU     :
    :
    :
    :
    :     No. 1007 WDA 2020

Appeal from the Order Entered August 13, 2020
In the Court of Common Pleas of Westmoreland County Orphans' Court
at No(s): 138 of 2019


IN RE: ADOPTION OF: C.A.J.     :     IN THE SUPERIOR COURT OF
    :         PENNSYLVANIA
    :
APPEAL OF: C.A.J., MINOR CHILD     :
    :
    :
    :
    :
    :     No. 1008 WDA 2020

Appeal from the Order Entered August 14, 2020
In the Court of Common Pleas of Westmoreland County Orphans' Court
at No(s): 138 of 2019


- 2 -

J-S03016-21
J-S03017-21

| | | |
|---|---|---|
| IN RE: ADOPTION OF: C.M.J. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: C.M.J., MINOR CHILD | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1055 WDA 2020 |

Appeal from the Order Entered August 13, 2020
In the Court of Common Pleas of Westmoreland County Orphans' Court
at No(s):  No. 137 of 2019


| | | |
|---|---|---|
| IN RE: ADOPTION OF: A.M.J. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: A.M.J., MINOR CHILD | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1056 WDA 2020 |

Appeal from the Order Entered August 13, 2020
In the Court of Common Pleas of Westmoreland County Orphans' Court
at No(s):  136 of 2019


| | | |
|---|---|---|
| IN RE: ADOPTION OF: L.M.J. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: L.M.J., MINOR CHILD | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1057 WDA 2020 |

Appeal from the Order Entered August 13, 2020
In the Court of Common Pleas of Westmoreland County Orphans' Court
at No(s):  No. 135 of 2019

| IN RE: ADOPTION OF K.M.J. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: K.M.J., MINOR CHILD | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1058 WDA 2020 |

Appeal from the Order Entered August 14, 2020
In the Court of Common Pleas of Westmoreland County Orphans' Court
at No(s):  134 of 2019

BEFORE:   DUBOW, J., MURRAY, J., and STRASSBURGER, J.[*]

MEMORANDUM BY MURRAY, J.:                           **FILED: MARCH 12, 2021**

In these consolidated appeals, Westmoreland County Children's Bureau (WCCB) appeals from the August 13, 2020 orders denying its petitions for the involuntary termination of the parental rights of A.M.J. (Mother) and J.T.J. (Father) to their five daughters, C.M.J., born in June of 2011, A.M.J., born in February of 2009, L.M.J., born in August of 2006, K.M.J., born in November of 2004, and C.A.J., born in July of 2012 (collectively, the Children).  In related appeals, the Children, through their legal counsel (Counsel), appeal from the same orders.  We reverse the orders and remand this case in accordance with this memorandum.

The orphans' court summarized the factual and procedural history as follows:

---

[*] Retired Senior Judge assigned to the Superior Court.

- 4 -

The . . . family first became active in the child welfare system in 2010 with allegations of domestic violence and drug and alcohol issues. The children were reunified with the parents in 2012 or 2013 after the family made sufficient progress with services. Between the years of 2013 and 2018, the family resided in Allegheny County. Upon their return to Westmoreland County, the WCCB was again referred to them for services related to homelessness and parental drug and alcohol concerns. The [C]hildren were adjudicated in December 2018, and the parents were recommended to participate in drug and alcohol services, mental health services, and parenting services. Additionally, Father was to complete anger management and domestic violence counseling.

While the [C]hildren have been in placement over the past twenty or so months, the parents have struggled to complete the recommended services to satisfy the WCCB that the [C]hildren should be returned. Mother had been unsuccessfully discharged from drug and alcohol treatment in November 2019. Mother provided no evidence of any mental health treatment. Meanwhile, Father had been struggling with addiction issues, with his most recent positive drug screen coming in April of 2019. Father then enrolled in what was described as a dual-diagnosis treatment program offered through the Veterans' Affairs (VA) office in Pittsburgh. He successfully completed a 21-day inpatient program for his addiction and then transitioned in the domiciliary step of the program, where he remained from May to July of 2019. Father reported that, if he had screened for any illicit substances during his stay, he would have been removed from the program. Additionally, this program offered him a chance to address his mental health diagnosis of post-traumatic stress disorder, anxiety and depression, as well as seek assistance to address anger management.

Regarding visitation with the [C]hildren and parenting instruction, which was to take place in conjunction with the visits, the WCCB reports that the parents only participated in six parenting sessions. In all, the WCCB believes that these six sessions represent the entirety of Father's visitation with the [C]hildren, while Mother visited a total of 25 times. Father contended that he did not have the same opportunity to visit as Mother, due to his periods of incarceration and due to the family's removal from the transportation list under the WCCB contract with Justice Works Youth Care. Finally, in December 2019, visitation was suspended

after a finding that continued visitation was not in the best interest of the [C]hildren at the time, and that the [C]hildren were experiencing anxiety around the visits, even manifesting itself in the form of nausea.

. . .

Trial Court Opinion, 10/9/20, at 2–4.

On December 19, 2019, WCCB filed petitions for the involuntary termination of Mother's parental rights to the Children pursuant to 23 Pa.C.S. § 2511(a)(2), (8), and (b). That same day, WCCB filed petitions for the involuntary termination of Father's parental rights to be Children pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (8), and (b).

The court held an evidentiary hearing on July 9, 2020, during which Mother and Father were represented by separate counsel. However, Mother did not appear for the hearing. The Children's best interests were represented by a guardian *ad litem* (GAL), and separate counsel represented their legal interests.

WCCB presented testimony from its supervising caseworker, Molly Clayton, who testified that she first became involved with this family in the fall of 2010, when K.M.J., L.M.J., A.M.J., and their older brother, N.J., who is not a subject of this appeal, were placed in the custody of WCCB due to their parents' domestic violence and drug and alcohol issues. At that time, C.A.J. and C.M.J. were not born. N.T., 7/9/20, at 54. Ms. Clayton testified that the family was reunified, but she did not specify the date. *Id.* at 55.

Ms. Clayton testified that the Children were adjudicated dependent on December 18, 2018, due to their parents' homelessness and continued drug and alcohol issues. *Id.* Ms. Clayton testified that Mother and Father were offered supervised visitation to occur together. *Id.* at 60–61. Mother attended 25 of 42 visits that were offered until December 20, 2019, when the court suspended supervised visitation, for reasons that are discussed *infra*. *Id.* at 61–62. Ms. Clayton testified that Mother's last visit was on October 21, 2019. *Id.* at 62. Father attended six visits total, and his last visit was on April 1, 2019. *Id.* at 60, 67.

Ms. Clayton testified that C.M.J., C.A.J., and A.M.J. have resided in their current pre-adoptive foster home for 15 months. *Id.* at 79. The older children, K.M.J. and L.M.J., have resided with their younger siblings in the same pre-adoptive foster home for five months. *Id.* Ms. Clayton testified that WCCB caseworker Sue Reese visits the Children in their foster home every 30 days at a minimum. *Id.* at 80. She testified that the Children "are all doing very well." *Id.* Ms. Clayton testified on cross-examination by the guardian *ad litem* (GAL) that the Children "expressed a willingness to have [Mother's and Father's] rights terminated and move forward with the adoption process." *Id.* at 88. The exchange continued:

> Q. And each of them said that they not only want their parents' rights to be terminated, but that they want to be adopted by their foster family; is that correct?
>
> A. Correct.

Q. And the discussion was had that adoption and termination, they're permanent things, correct?

A. Yes. That was addressed with the [C]hildren individually, age-appropriately by Ms. Reese, as well as Ms. O'Hara.

*Id.* at 88.

Mary O'Hara, the Children's mental health therapist, also testified on behalf of WCCB, *via* telephone. Ms. O'Hara testified that the Children were referred for therapy due to witnessing "domestic violence between [M]other and [F]ather when [F]ather was not incarcerated. Then, the family had a cycle of drug and alcohol abuse, as well as moving frequently, being evicted, and periodic homelessness." N.T., 7/9/20, at 12. Ms. O'Hara began providing individual therapy for C.M.J., C.A.J., and A.M.J. in November of 2018, and for K.M.J. and L.M.J. in December of 2018. *Id.* at 11–12. Ms. O'Hara testified that the Children's goal was to:

mostly deal[] with anger in a healthy way. Occasionally, they would become . . . verbally aggressive where there is yelling or name-calling. Some of them had negative self-concepts, so they had negative concepts about themselves, low self-esteem was common across-the-board. In dealing with trauma, all of them would identify trauma symptoms, whether it be . . . difficulty trusting [or difficulty] communicating their needs. . . .

*Id.* at 13. Ms. O'Hara identified the causes of the Children's trauma as:

largely, chronic homelessness, being left unattended. A lot of them would communicate that . . . they moved frequently, so they

never really had the opportunity to settle down.[1]  The utilities wouldn't be turned on, [they were] left unattended, [they] witness[ed] violence.  All of them reported witnessing violence.

*Id.*

Ms. O'Hara diagnosed K.M.J., A.M.J., and C.M.J. with adjustment disorder and anxiety.  *Id.* at 14, 24, 29.  In addition, she diagnosed A.M.J. with acute stress disorder.  *Id.* at 24.  Ms. O'Hara diagnosed L.M.J. with adjustment disorder and depression, and C.A.J. with adjustment disorder unspecified.  *Id.* at 20, 32.  She testified that the Children are progressing well in therapy.  *Id.* at 15, 21, 25–26, 30, 32.

Ms. O'Hara testified that on October 10, 2019, she wrote a letter describing the effect supervised visitation was having on the Children, stating:[2]

> I had observed emotional, behavioral, and physical responses on the [C]hildren after visits with their parents.  During the therapy sessions, they had mentioned a desire to discontinue visiting with their parents, saying things like, well, I already saw them, do I have to go?  Before and after visits, [A.M.J.] had demonstrated increased aggression and anxiety, as well as nausea.  [L.M.J.] had also had experiences of headaches, nausea prior to and after the visits with her parents.  [K.M.J.] had reported to the clinician that she experiences trauma symptoms, including flashbacks and panic

---

[1] Father testified on cross-examination by the Children, through Counsel, that within the last five years, he moved three times with them, all between different school districts.  N.T., 7/9/20, at 140–141.

[2] Ms. O'Hara does not specify to whom she wrote the letter, but we glean from the record that the letter was presented as evidence at the motions hearing on WCCB's request to discontinue supervised visitation, which was held on December 20, 2019.  N.T., 7/9/20, at 62.

attacks after certain triggers, and does not wish to have contact with her parents at the time.

*Id.* at 17.

With respect to the youngest two children, Ms. O'Hara testified, "[C.M.J.] had behaviors, such as . . . making herself sick, so she would try to make herself throw up to say that she was sick. [C.A.J.] would say specifically that she just prefers to stay with [the foster parents], not that she didn't care about her parents, but that she just didn't want to be with them." *Id.* at 18. Ms. O'Hara testified that the Children experienced "a decrease in overall anxiety and aggression" after visitation with their parents was suspended. *Id.* In addition, she testified that the Children never expressed a desire to her that visitation with their parents be resumed. *Id.*

Ms. O'Hara testified that she discussed the termination of parental rights with the Children. *Id.* at 16. With respect to K.M.J., the oldest child, then 15 years old, Ms. O'Hara testified:

> [K.M.J.] said that she believes that . . . where she is [living] right now is able to offer her what she needs, and what she needs, because I asked her what that meant, is [the foster parents are] able to attend to any of her medical needs. She's doing well in school. She would like to be able to advance to her appropriate grade, and she knows that she's able to do that where she is. There's always food on the table. She has her own room, which is something she has never had. She feels comfortable and safe where she is.

*Id.* Ms. O'Hara testified that L.M.J., then 13 years old, "reported largely the same thing as [K.M.J.]." *Id.* at 22. Specifically, Ms. O'Hara testified that L.M.J. has gone "to the doctor, and she said she couldn't remember the last

time that she'd gone to a doctor. Again, she didn't realize how long it has been since she had gone to the dentist. She understands that it's necessary and these are things that parents are supposed to do." *Id.* With respect to A.M.J., then 11 years old, Ms. O'Hara testified:

> She would like to stay where she is. She feels safe. When we talk about it, it will cause her a lot of anxiety, so . . . it's something that we had to do in small doses over a long period of time. She feels safe where she is. For her, the thought of not being where she is causes a great deal of distress.

*Id.* at 26. Ms. O'Hara testified that C.M.J., then 9 years old, told her that she "would like to stay where she is." *Id.* at 30. Regarding C.A.J.'s preference, who was nearly 8 years old, Ms. O'Hara testified:

> [C.A.J.] shared that she is grateful for her foster parents, and that she understands that she has two moms. She understands that she will love her biological mom; however, she wants to stay with her foster parents, and that they are also her parents.

*Id.* at 33.

In addition to the above testimony, WCCB introduced, and the court admitted into evidence the following documents: Father's and Mother's criminal dockets from Westmoreland County; Ms. O'Hara's reports dated June 8, 2020; permanency review orders dated June 22, 2020, December 20, 2019, and May 31, 2019 with respect to K.M.J.; permanency review orders dated June 22, 2020, November 26, 2019, and May 31, 2019 with respect to L.M.J., A.M.J., C.A.J., and C.M.J.; and the Children's orders of adjudication and disposition dated December 18, 2018.

Father testified on his own behalf, and the court admitted documents he introduced from the VA Pittsburgh Healthcare System, dated December 5, 2019. The documents described his attendance and completion of the Center for Treatment of Addictive Disorders (CTAD) residential program from April 11, 2019, through May 1, 2019. In addition to not appearing for the hearing, Mother did not present any testimony or documentary evidence.

On August 13, 2020, the orphans' court denied WCCB's petitions to both Mother and Father by a single order that included the separate docket numbers for the Children and filed at K.M.J.'s docket only. On August 14, 2020, the court entered the order on the Children's separate dockets.

On September 10, 2020, the Children, through Counsel, filed notices of appeal and concise statements of errors complained of an appeal, which this Court consolidated *sua sponte*.[3] On September 11, 2020, WCCB timely filed notices of appeal and concise statements of errors complained of on appeal

_____

[3] The Children filed separate notices of appeal at each of the five docket numbers. Each notice contained a caption listing the separate docket numbers. However, the body of each notice identified a single child, and the notice was filed at that child's docket. In **Commonwealth v. Walker**, 185 A.3d 969, 971 (Pa. 2018), our Supreme Court held, "[W]here a single order resolves issues arising on more than one docket, separate notices of appeal must be filed for each case." This Court held in **Commonwealth v. Johnson**, 236 A.3d 1141, 1148 (Pa. Super. 2020) (*en banc*), that although each notice of appeal contained multiple docket numbers, it was "of no consequence," because the defendant complied with **Walker** by filing a separate notice at each docket. Likewise, the Children have complied with **Walker** by filing separate notices of appeal at each docket.

which this Court consolidated *sua sponte*. On October 9, 2020, the orphans'

court filed an opinion pursuant to Pa.R.A.P. 1925(a).

WCCB presents the following issues for our review:

1.) [Did] [t]he [orphans'] court err[] in finding that the [WCCB] failed to prove its case by clear and convincing evidence when it denied the agency's Petition for Involuntary Termination of Parental Rights of . . . [Father] pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (8), and (b)[?]

2.) [Did] [t]he [orphans'] court err[] in finding that the [WCCB] failed to prove its case by clear and convincing evidence when it denied the agency's Petition for Involuntary Termination of Parental Rights of . . . [Mother] pursuant to 23 Pa.C.S. § 2511(a)(2), (8), and (b)[?]

3.) [Did] [t]he [orphans'] court err[] in denying that [Father] ". . . by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child for has refused or failed to perform parental duties[?]"

4.) [Did] [t]he [orphans'] court err[] in denying that the birth parents' ". . . repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being in the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent[?]"

5.) [Did] [t]he [orphans'] court err[] in denying that "the child has been removed from the care of the parent by the court or under a voluntary agreement with the agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continued to exist and termination of parental rights would best serve the needs and welfare of the child[?]"

6.) [Did] [t]he [orphans'] court err[] in denying that "the court in terminating the rights of the parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of the parent shall not be

terminated solely on the basis of environmental factors such as inadequate housing, furnishing, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6), (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition [?]"

WCCB Brief at 4–6.[4]

The Children, through Counsel, state their issue as follows:

I.      Whether the [orphans'] court erred in finding by clear and convincing evidence [that WCCB] did not meet its burden under 23 Pa.C.S. § 2511(a) and 23 Pa.C.S. § 2511(b) when denying the termination for [M]other and [F]ather?

Children's Brief at 4.[5]

We begin our analysis cognizant of the following:

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

_____

[4] The Children, through Counsel and the GAL, have filed separate briefs in support of WCCB's claims. Father has filed a brief; Mother has not participated in this appeal.

[5] WCCB advised this Court that it agrees with the Children's brief, and therefore would not file a responsive brief. The GAL filed a brief in support of the Children's issue. Father filed a brief in opposition, and Mother has not participated.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations omitted).

Termination of parental rights is governed by Section 2511 of the

Adoption Act, which requires a bifurcated analysis.

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

Instantly, WCCB asserted the following statutory grounds for the

involuntary termination of Mother's and Father's parental rights:

> **(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> > (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.
> >
> > (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

. . .

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

. . .

**(b) Other considerations.—**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(1), (2), (5), (8), (b).

With respect to Section 2511(a)(1), our Supreme Court has held:

Once the evidence establishes a failure to perform parental duties or a settled purpose of relinquishing parental rights, the court must engage in three lines of inquiry: (1) the parent's explanation for his or her conduct; (2) the post-abandonment contact between parent and child; and (3) consideration of the effect of termination of parental rights on the child pursuant to Section 2511(b).

*In re Adoption of Charles E.D.M.*, 708 A.2d 88, 92 (Pa. 1988). Further,

the trial court must consider the whole history of a given case and not mechanically apply the six-month statutory provision. The court must examine the individual circumstances of each case and consider all explanations offered by the parent facing termination of his or her parental rights, to determine if the evidence, in light of the totality of the circumstances, clearly warrants the involuntary termination.

*In re N.M.B.*, 856 A.2d 847, 854–55 (Pa. Super. 2004) (citations omitted).

Our Supreme Court has stated that parental duty "is best understood in relation to the needs of a child." *In re Burns*, 379 A.2d 535, 540 (Pa. 1977).

> A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this Court has held that the parental obligation is a positive duty which requires affirmative performance. This affirmative duty encompasses more than a financial obligation; it requires continuing interest in the child and a genuine effort to maintain communication and association with the child. Because a child needs more than a benefactor, parental duty requires that a parent 'exert himself to take and maintain a place of importance in the child's life.'

*Id.* (citations omitted); *see also In re B.,N.M.*, 856 A.2d 847, 855 (Pa. Super. 2004) (internal citations omitted) (stating that a parent does not perform his or her parental duties by displaying a "merely passive interest in the development of the child").

With respect to Section 2511(a)(2), this Court has explained that the moving party must produce clear and convincing evidence regarding the following elements to terminate parental rights: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied. *In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003).

Pursuant to Section 2511(a)(2), parents are required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities. *In re A.L.D.* 797 A.2d 326, 340 (Pa. Super. 2002). A parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous. *Id.* Further, the grounds for termination of parental rights under Section 2511(a)(2), due to parental incapacity that cannot be remedied, are not limited to affirmative misconduct; to the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties. *Id.* at 337.

With respect to Section 2511(a)(8), the following factors must be demonstrated: (1) the child has been removed from parental care for 12 months or more from the date of removal; (2) the conditions which led to the removal or placement of the child continue to exist; and (3) termination of parental rights would best serve the needs and welfare of the child. *In re Adoption of M.E.P.*, 825 A.2d at 1275–76.

We have explained, "Section 2511(a)(8) sets a 12-month time frame for a parent to remedy the conditions that led to the children's removal by the court." *In re A.R.*, 837 A.2d 560, 564 (Pa. Super. 2003). Once the 12-month period has been established, the court must next determine whether the conditions that led to the child's removal continue to exist, despite the reasonable good faith efforts of [the child welfare agency] supplied over a

realistic time period. *Id.* Termination under Section 2511(a)(8) does not require the court to evaluate a parent's current willingness or ability to remedy the conditions that initially caused placement or the availability or efficacy of [the child welfare agency] services. *In re Adoption of M.E.P.*, 825 A.2d at 1276.

With respect to Section 2511(b), "[i]ntangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005) (citation omitted). The trial court "must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond." *Id.* (citation omitted). However, "[i]n cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of any bond analysis, therefore, necessarily depends on the circumstances of the particular case." *In re K.Z.S.*, 946 A.2d 753, 762–63 (Pa. Super. 2008) (citation omitted).

Instantly, WCCB asserted Section 2511(a)(1) against Father only. The orphans' court explained: "Father was participating in a [VA] dual diagnosis treatment program to address his mental health and drug and alcohol needs. While Father was not visiting often with the [C]hildren, the Permanency Review Order following the May 31, 2019 hearing stated that Father had no major parenting deficiencies and was participating with a hands-on parenting

provider when he was able to attend visits." Trial Court Opinion 10/9/20, at 4–5. The court continued:

> It should be noted that, shortly after the WCCB filed for termination, Mother and Father's visits were suspended by [o]rder of [c]ourt, following testimony presented to the [c]ourt on December 18, 2019. Testimony during the termination hearing suggested that the suspension of the visits was related to physical and emotional reactions that the [C]hildren were experiencing around visitation, as well as the fact that the WCCB had recently filed for termination. If the parents had been provided with the opportunity to continue to visit the [C]hildren, perhaps in a more therapeutically appropriate setting to assist the [C]hildren with their behaviors, the parents would have been given an opportunity to perform parental duties.
>
> For these reasons, the court found that the WCCB failed to meet its burden under Section 2511(a)(1).

*Id.* at 5.

> Regarding Section 2511(a)(2), the court stated:
>
> The record is replete with evidence of the parents' issues, including substance abuse issues, mental health issues, anger management issues, housing and a lack of steady employment. It is clear that the parents have had issues in the past. Evidence also illustrates that Father has put forth efforts to address and remedy these issues. What is not clear to the [c]ourt at this point is whether these issues can be remedied. It is clear to the [c]ourt, however, that the WCCB has not proven by clear and convincing evidence that these issues cannot or will not be remedied.
>
> For this reason, the court found that the evidentiary burden for Section 2511(a)(2) has not been met.

*Id.* at 5–6.

> With respect to Section 2511(a)(8), the court found:
>
> Again it is undisputed that Mother and Father have issues which led the [C]hildren to be in placement. What remains unclear to the court is whether the best interest of the [C]hild[ren] will be

served by termination. Certainly the [c]ourt was presented evidence that the [C]hildren are thriving in their foster placement. As Father continues to progress in his mental health treatment, reportedly in a better place to care for his children than when this matter started, the [c]ourt is not yet convinced that termination would serve the [C]hildren's best interests.

For this reason, the court found that the WCCB failed to meet its burden under Section 2511(a)(8).

Trial Court Opinion, 10/9/20, at 6.[6]

The court addressed Section 2511(b):

[A]lthough the second-half of the bifurcated analysis is not required unless the court finds that a particular ground under Section 2511(a) is met, [WCCB] would nonetheless need to prove that the [C]hildren's developmental, physical and emotional needs and welfare would be served by termination. Again, the [c]ourt reiterates that Father should be given an opportunity to manage the relationship with his children and serve their developmental, physical and emotional needs. Additionally, the [c]ourt cannot say at this point that terminating Mother's parental rights while maintaining Father's intact would best serve the needs of the [C]hildren either.

For these reasons, the [c]ourt found that the WCCB did not meet its burden under Section 2511(b).

*Id.* at 7.

The court concluded, "While the case for termination under the alleged grounds may be stronger for Mother than for Father, the [c]ourt does not believe that it would be in the best interest of the [C]hildren to terminate one

---

[6] Section 2511(a)(8) is inapplicable to Father because he was incarcerated at the time the Children were placed. N.T., 7/9/20, at 119. Therefore, the Children were not removed from Father's care. *In re C.S.*, 761 A.2d 1197 (Pa. Super. 2000) (*en banc*).

parent while leaving the other's rights intact. Therefore, it cannot be said at this time whether the developmental, physical and emotional needs of the [C]hildren would be best served through terminating one or both of the parents' rights at this time." *Id.* at 7–8.

After careful review, we find that the trial court abused its discretion by deciding that Mother's parental rights should not be terminated solely because it determined that Father's conduct did not warrant termination. Our Supreme Court has stated:

> Nothing in the Adoption Act requires that an agency, which has assumed custody of a child, must establish grounds for the involuntary termination of both parents, before it can obtain such a decree as to either. When an agency having custody of a child petitions for termination of parental rights, the rights of the respective natural parents must be determined independently.

*In re Burns*, 379 A.2d 535, 541 (Pa. 1977); *In re C.W.U.*, *Jr.*, 33 A.3d 1 (Pa. Super. 2011) (reversing the decree denying the termination of the father's parental rights when it was based solely on the mother's parental rights not being terminated).

We first address Mother's conduct as shown by the record evidence as it pertains to termination under Section 2511(a)(2) and (8). We are mindful of the family service plan ("FSP") objectives for both Mother and Father: obtain updated drug and alcohol evaluations and follow all recommendations; participate in random drug screens; obtain mental health evaluations and follow all recommendations; participate in parenting instruction which would occur during supervised visitation; and obtain and maintain safe and clean

housing.  N.T., 7/9/20, at 56–57, 60, 66.  Further, Father was to complete anger management.  ***Id.*** at 57.

Ms. Clayton testified that Mother did not successfully complete her drug and alcohol requirement insofar as she was unsuccessfully discharged from treatment on September 11, 2019, and the treatment program gave her a poor prognosis at that time.  ***Id.*** at 57–58.  Mother participated in 12 of 34 possible drug screens; she tested positive in all 12.  ***Id.*** at 58.  Ms. Clayton testified that the test results were "consistently positive for cocaine, methadone, fentanyl, norfentanyl[,] and morphine."  ***Id.*** at 59.  In addition, Mother never advised WCCB that she received mental health treatment, and WCCB never received documentation of treatment.  ***Id.*** at 59–60.

Mother participated in "hands-on parenting" during visitation with the Children.  ***Id.*** at 60.  Ms. Clayton testified Mother "was generally appropriate" during the visits.  ***Id.*** at 61.  However, she also testified Mother "chose to not participate in visitation" after her last visit on October 21, 2019.  ***Id.*** at 62.

With respect to housing, Ms. Clayton testified during the following exchange:

Q. Do you know if [M]other has stable and appropriate housing?

A.  She has not had communication with [WCCB,] and we are not aware of any home where she's living.

Q. Do you know how to reach [M]other?

A. No. . . .

***Id.*** at 63.

Based on the foregoing, the orphans' court abused its discretion in failing to involuntarily terminate Mother's parental rights pursuant to Section 2511(a)(2). The record demonstrates unequivocally Mother's repeated and continued incapacity, neglect, or refusal to remedy her drug addiction, address her mental health, and maintain appropriate housing. Consequently, the Children were without essential parental care, control or subsistence necessary for their physical or mental well-being. Mother has struggled with these same issues since 2010, when WCCB first became involved with the family. On this record, WCCB proved by clear and convincing evidence that the causes of Mother's incapacity, neglect, or refusal cannot or will not be remedied.

Likewise, the court abused its discretion in failing to involuntarily terminate Mother's parental rights pursuant to Section 2511(a)(8). The Children, by the time of the subject proceeding, had been removed from Mother's care for more than 18 months, which is in excess of the statutory 12-month minimum. The record indicates that Mother's issues with drug addiction, mental health and homelessness have not been remedied.

In addition, the record supports a finding that termination of Mother's parental rights serves the Children's best interests. Ms. O'Hara detailed the negative physical and mental effects that supervised visitation had on the Children, and the Children's improvement once visits ceased. Indeed, Ms. O'Hara testified that the Children do not have necessary and beneficial

relationships with Mother and Father. N.T., 7/9/20, at 19–20, 23, 28–29, 31, 33. In contrast, the Children have safe, loving, and healthy relationships with their foster parents. *Id.* Therefore, we are constrained to conclude that the orphans' court abused its discretion in failing terminate Mother's parental rights under Section 2511(a)(8).

Next, we address Father's conduct as shown by the record evidence as it pertains to Section 2511(a)(1) and (2). Father testified that he was incarcerated from approximately mid-August 2018, until approximately mid-February 2019.[7] N.T., 7/9/20, at 93, 95. Father testified that after his release from prison, he attended supervised visitation. *Id.* at 95. Ms. Clayton testified that Father attended six of a total 27 visits offered. *Id.* at 67. She testified that WCCB performed four random drug screens of Father, which

_____

[7] Father's testimony about his criminal history during the relevant time period is unclear. Father testified that when the Children were removed from Mother's care, he was incarcerated for a second conviction of driving under the influence (DUI). N.T., 7/9/20, at 119. Father said emphasized, "I don't drink now." *Id.* at 121.

The court admitted into evidence Father's Westmoreland County criminal docket, which reveals that he was initially incarcerated in Allegheny County jail. Exhibit WCCB 1. Father was charged with simple assault and harassment in Westmoreland County. *Id.* While awaiting trial on those charges, Father was placed in the Renewal Center, a halfway house, for a drug and alcohol program, at a time unspecified. *Id.*; N.T., 7/9/20, at 93. Father's criminal docket also reveals that Westmoreland County issued a bench warrant on January 30, 2020, due to Father's failure to appear for his non-jury trial scheduled that day. Exhibit WCCB 1. The record indicates that at the time of the final permanency hearing on June 22, 2020, Father had "outstanding bench warrants for criminal cases." Permanency Order, 6/22/20, at 3.

occurred during the supervised visits, and all of the screens were positive for cocaine. *Id.* at 65; N.T., 7/9/20, at 129 (Father acknowledged that he went to the visits, was tested for drugs, and tested positive for cocaine).

Ms. Clayton testified that Father's last supervised visit was on April 1, 2019. *Id.* at 67. Since then, Father has never sent cards or gifts to the Children, and has never inquired about the Children. *Id.* at 74.

Ms. Clayton additionally testified that transportation for the parents to attend supervised visitation was made available through JusticeWorks, "but it was discontinued, due to multiple no-shows and cancellations on the part of the parents." *Id.* at 71. She stated that Father "didn't state that he was in need of transportation until yesterday [when he telephoned WCCB and requested transportation to the termination hearing]." *Id.* at 70–71.

Father testified about his supervised visitation after his release from prison in mid-February 2019, stating:

> I was given the opportunity to attend a few of them and then we missed the ride the one time so [Mother], I guess, already missed a couple rides, so automatically, right out the door, I missed one ride and I am cut off.

*Id.* at 95. He subsequently explained, "If they would've kept giving me the rides, I'd have kept going." *Id.* at 127-128.

However, Father also testified that on April 11, 2019, he was admitted into the VA program, which explained his failure to attend supervised visitation after April 1, 2019. *Id.* at 96. Ms. Clayton explained that the VA program was to help Father "get back on his feet" and included "different milestones

that he needed to reach to successfully complete it." *Id.* at 64. Father testified that the program included three phases. *Id.* at 120.

The first phase Father described as "the flight deck," and he acknowledged that it was a "mental health commitment." *Id.* at 121. Father testified that he voluntarily committed himself because "I was up for about two months straight drinking heavily, heavy drug use. I was really bad into cocaine. I mean, we spent thousands of dollars in, like, two weeks." *Id.* Father also testified, "I was attempting to commit suicide." *Id.* Father testified that he was in-patient in this phase for approximately two and one-half weeks, and the doctor diagnosed him with posttraumatic stress disorder, anxiety, and depression. *Id.* at 122.

Father testified that he also admitted himself into the next phase of the program at the Center for Treatment of Addictive Disorders (CTAD). He remained in-patient at the CTAD for 21 days, and Ms. Clayton testified that he successfully completed this phase. *Id.* at 64. Father testified that he participated in anger management classes, among others, during this phase. *Id.* at 123.

The final phase of the program was the "domiciliary residential rehabilitation treatment program"; Ms. Clayton testified Father entered this phase on May 1, 2019. *Id.* at 64. Father described this phase as allowing him to live there, "let you get a job, . . . get your feet straight. . . ." *Id.* at 104. Father's testimony regarding his length of stay is inconsistent. He first

testified on direct examination that he remained in the third phase for five and one-half months. *Id.* at 96. Ms. Clayton testified that Father remained in this phase only until July of 2019, which Father corroborated on cross-examination by WCCB. *Id.* at 64, 123.

Father testified he was drug screened throughout the various phases of the VA program, and acknowledged on cross-examination by WCCB, that they "were all clean." *Id.* at 127. Father stated that he currently attends both individual and group therapy through the VA. *Id.* at 142–143. He also testified regarding his prescribed medications for depression and insomnia, among others. *Id.* at 147–151.

Ms. Clayton testified that permanency review hearings occurred on May 31, 2019, November 26, 2019, and June 22, 2020. *Id.* at 71–72. She testified that the juvenile court found in the first and second hearing that Father's compliance and progress with his FSP goals was minimal. *Id.* at 71–72. Ms. Clayton testified that the court found in the third hearing, approximately one month before the subject proceeding, that Father's compliance and progress was none. *Id.* at 72.

In its Rule 1925(a) opinion, the orphans' court emphasized the finding in the first permanency review order that Father was participating in the VA program, and based on his six supervised visits, he did not demonstrate any "major parenting deficiencies." Trial Court Opinion, 10/9/20, at 4–5; Permanency Order, 5/31/19, at 2. The court ignored findings in the order that

Father was offered a total of 15 visits during the first review period, and of the six he attended, he had four positive drug screens.

During the next review period, from May 31, 2019, until November 26, 2019, the juvenile court found Father did not participate in any of the 13 supervised visits offered. Permanency Order, 11/26/19, at 2. Further, the court found that WCCB "has been unable to screen Father, as his whereabouts were unknown and he did not attend visits with" the Children. *Id.* In addition, the court determined Father "does not have stable or independent housing. . . ." *Id.* As such, the juvenile court concluded that Father made no progress toward alleviating the circumstances which necessitated the Children's placement. *Id.* Approximately one month later, WCCB filed the termination petitions.

At the time of the termination proceeding, Ms. Clayton testified she had no documentation proving that Father successfully completed the third and final phase of the VA program. N.T., 7/9/20, at 64. Father testified that he successfully completed it, but provided no documentation to support his assertion. *Id.* at 124.

Likewise, Ms. Clayton had no evidence to support Father's assertion that he obtained a mental health evaluation and was successfully discharged from mental health treatment. The following exchange occurred:

Q. Are you aware if [F]ather completed a mental health evaluation?

A. Father stated, while he was at the VA, he had a mental health evaluation. Our agency twice tried to subpoena records from the VA. [The VA] contacted [us] and stated they didn't have to respond to a [WCCB] subpoena. They only respond to federal subpoenas. Myself and Ms. Reese made [F]ather and [his attorney] aware that, if there was documentation, [F]ather would need to get that and provide it to us, and I have not seen any verification.

Q. Do you know if [F]ather was successfully discharged from his mental health treatment?

A. I don't have any documentation. I don't know that answer.

*Id.* at 66.

With respect to housing, Ms. Clayton testified on direct examination:

Q. Do you know if [F]ather has a stable and appropriate house?

A. Father reported an address to me yesterday afternoon about 3:30 p.m. I don't know if it's his home, if it's a rental agreement, so I don't know if it's appropriate. That was the first time that he has given an address.

*Id.* at 68.

Father testified that he had a one-bedroom efficiency apartment. *Id.* at 131. He stated, "It's not sufficient to take the kids home, but, you know, I had to start from somewhere. . . ." *Id.* at 102. In addition, Father testified on direct examination:

Q. [I]f you were to have your children return to you, would there be services for you to be afforded bigger housing through the veterans benefits?

A. Yes. . . . They help with housing and they were going to help me with my housing I got now, but I was able to get it for my mental now, you know, my mental disability. I was able to get housing for me, but now I got housing on the back burner for . . . if I get notice from [WCCB] and it says that, you know, kids are

coming back to you or whatever, you know, even if it's in stages, you know, do visits first or whatever like that, I can take the paperwork and get funding for a bigger house where I would not have to, you know, the homelessness is no longer an issue.

*Id.* at 111.

Upon review, the record supports Ms. Clayton's testimony that Father failed to perform his parental duties within six months of the filing of the termination petitions, *i.e.*, June 2019. *Id.* at 74. The evidence demonstrates that throughout the Children's dependencies, dating back to 2010, Father has failed to fulfill his parental duties to the Children's detriment. Therefore, we are constrained to conclude that the orphans' court abused its discretion in determining that Father's conduct did not warrant termination under Section 2511(a)(1).

With respect to Section 2511(a)(2), Ms. Clayton testified:

As I stated before, [this] family has been familiar to myself since 2010. There is a cycle of alcohol abuse, drug addiction, homelessness, domestic violence. It has led to truancy. It is something that has not rectified itself in the ten years that I've known the family. There have been brief periods where it has gotten better, but again, at least in the last two years, there has been no progress in alleviating the circumstances that necessitated placement. There's also continued involvement with the parents with law enforcement.

*Id.* at 75. Ms. Clayton testified that the parents' failures have caused the Children to be without essential parental care, control, or subsistence necessary for their well-being. *Id.* She explained:

The [C]hildren didn't have stable housing. The older girls, [K.M.J.] and [L.M.J.], they felt, when the family was in Allegheny County, that they needed to stay home and care for their younger siblings.

> They had upwards of 80 illegal absences that was impacting their
> education. The [C]hildren have all expressed fear of the continued
> domestic violence in the home.
>
> . . .
>
> There has been continued drug addiction that leads to basic needs
> not being met, so no shelter, no food. So it is those basic things
> that the kids continued to struggle with.

*Id.* at 76. Ms. Clayton testified that the parents have not demonstrated the

ability to remedy the causes of their incapacity to provide for the Children.

*Id.*

Contrary to the court's conclusion, the record demonstrates that WCCB

proved clearly and convincingly that Father cannot or will not remedy his

issues under Section 2511(a)(2). The law requires that parents make "diligent

efforts towards the reasonably prompt assumption of full parental

responsibilities." *In re A.L.D.* 797 A.2d at 340. At the time of the subject

proceeding, Father did not have housing for the Children. Further, despite

involvement with the VA program from April until approximately July of 2019,

there was no confirming evidence that Father completed the third and final

phase of the program or had remedied his drug and alcohol addiction, his

criminal problems, or his domestic violence tendencies.[8] Father's testimony

was self-serving testimony and inadequate, particularly in light of the many

---

[8] Father testified that he and Mother remained married, but separated. He
testified that they do not live together. However, they continue to interact.
N.T., 7/9/20, at 141, 144.

- 32 -

years that had passed, and the impact of Father's inaction and the passage of time on the Children. *Id.*; *In re E.A.P.*, 944 A.2d 79, 83 (Pa. Super. 2008) (citation omitted) (reaffirming, "'Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with his or her physical and emotional needs.'"). Therefore, we are constrained to conclude that the orphans' court abused its discretion in failing to terminate Father's parental rights pursuant to Section 2511(a)(2).

Finally, we review the orders denying termination of Mother's and Father's parental rights with respect to the Children's developmental, physical, and emotional needs and welfare pursuant to Section 2511(b). Our Supreme Court has stated, "Common sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." *In re T.S.M.*, *supra* at 268. The Supreme Court directed that, in weighing the bond considerations of Section 2511(b), "courts must keep the ticking clock of childhood ever in mind." *Id.* at 269. The Court observed, "[c]hildren are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail . . . the result, all too often, is catastrophically maladjusted children." *Id.*

Instantly, there is no record evidence that the Children have a necessary and beneficial relationship with either Mother or Father. N.T., 7/9/20, at 19,

23, 28, 31, 33 (Ms. O'Hara, the Children's mental health therapist, testified that none of the Children have a necessary and beneficial relationship with Mother and Father. Rather, she testified that the Children's relationship with the parents "caused stress, anxiety, and ultimately, was not healthy."); *Id.* at 50 (Ms. O'Hara testified that the Children, when describing their biological parents, "use their first names."). Indeed, Ms. O'Hara testified that the aforementioned negative effects have improved since supervised visitation has ceased.[9] *Id.* at 18. In addition, the Children have not asked to resume visitation with their parents. *Id.*

Further, both Ms. Clayton and Ms. O'Hara testified that the Children's preference regarding termination of Mother's and Father's parental rights has been discussed with them at length by the WCCB caseworker, Sue Reese, as well as in mental health therapy; the Children understand the permanency of involuntary termination; the Children prefer that Mother's and Father's parental rights be terminated; and the Children want to be adopted by their foster parents. *Id.* at 16, 22, 26, 30, 33, 88.

Ms. Clayton described the Children's relationship with Mother and Father as follows:

_____

[9] Ms. O'Hara testified that K.M.J. and A.M.J. need to continue with outpatient therapy. She explained, "[K.M.J. and A.M.J.], out of all of them, seem to have communicated the most amount of stress and anxiety related to their trauma history. They also show the most symptoms out of all of them, so I recommend that [outpatient therapy] continue with them." N.T., 7/9/20, at 34.

Q. Have the [C]hildren asked about the parents while in the foster home?

A. They rarely ask about mom and dad. When they ask, it's more asking, I hope mom has somewhere to stay, I hope mom is not using drugs. It's more asked like a parent would worry about a child.

*Id.* at 81. Ms. Clayton testified that the Children "voiced [during a supervised visitation with Father] how much time dad would actually come and spend with them, and they expressed their fear of him." *Id.* at 68. Upon thorough review, the record does not reveal a parent-child bond between the Children and Mother or Father.

Ms. Clayton testified that the Children reside together in the same pre-adoptive foster home, and they view their foster parents as their parents. *Id.* at 79–81. She testified:

Q. Would termination best serve the needs and welfare of [the C]hildren?

A. Yes.

. . .

Q. And why is that?

A. The [C]hildren are in a stable environment. They're able to go to school on a consistent basis. They're getting medical care. They're getting dental care. They're able to participate in social activities that let them grow emotionally and developmentally. They are safe.

*Id.* at 77–79. Accordingly, based on the totality of the record evidence, we are constrained to conclude that the orphans' court abused its discretion in

failing to terminate Mother's and Father's parental rights to the Children pursuant to Section 2511(b).

In sum, after careful consideration, and consistent with the court's sustainable factual findings, as well as prevailing law, including the applicable provisions of the Adoption Act, we conclude that the denial of the petitions for the involuntary termination of Mother's and Father's parental rights was an abuse of discretion. Accordingly, we reverse the orders and remand for the court to enter at the Children's dockets, within 10 days of the date of this memorandum, orders involuntarily terminating the parental rights of Mother and Father. *See M.A.T. v. G.S.T.*, 989 A.2d 11, 21 (Pa. Super. 2010) (*en banc*) (stating that where the record is sufficiently developed, we may substitute our judgment for that of the trial court and decide the case on the merits).

Orders reversed. Cases remanded with instructions. Jurisdiction relinquished.

Judge Dubow joins the memorandum.

Judge Strassburger did not participate.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/12/2021